UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

   - v. -                          :        13 Cr. 467 (SAS)

SETH BEOKU BETTS,                :

        Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York
                                Attorney for the United States
                                     of America.

Telemachus P. Kasulis
Assistant United States Attorney

    -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 13 Cr. 467 (SAS) |
| SETH BEOKU BETTS, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully writes in connection with the sentencing of defendant Seth Beoku Betts, scheduled for 4:30 p.m. on June 5, 2014. For the reasons set forth below, the Government submits that a Guidelines sentence of between 51 and 63 months' imprisonment is appropriate in this case.

A.   **Offense Conduct**

As described in the Pre-Sentence Report ("PSR") prepared by the United States Probation Office ("USPO"), from July 2008 through December 2012, the defendant engaged in a scheme to defraud a state university in the Midwest (the "University"). The defendant falsely represented to the Director of Cash and Investments (the "University Director") that, if given a substantial portion of the University's funds for investment, he would be able to return high yields on a quick basis through investment in collateralized mortgage obligations ("CMOs"). Although the University Director was, by her own admission, unfamiliar with CMOs and their valuation, she trusted the defendant, who represented himself as familiar with these securities, including on his firm's website. Accordingly, from July 2008 through December 2008, the University Director wired the defendant approximately $8.165 million of the University's funds, for investment in the defendant's CMOs.

The investments did not go well. They failed to return the quick profits the defendant had promised. But that was, in retrospect, unsurprising. While the defendant had used a portion of the funds to purchase some CMO securities – but not the ones that he indicated that he was going to purchase on the University's behalf – he also diverted millions of dollars of the University's money to purchase luxury goods for himself. The defendant spent hundreds of thousands of dollars on luxury automobiles. He spent hundreds of thousands of dollars on personal expenses. And he spent nearly $1.5 million to purchase a waterfront residence in Boynton Beach, Florida. At no time did he ever disclose to the University Director, or anyone else, that he was literally stealing millions of dollars from the University for his own personal use.

When the defendant told the University Director that their anticipated profits would not be forthcoming, the University Director resigned herself to more modest gains. But when the University Director inquired as to the whereabouts of the University's funds, the defendant engaged in a four-year saga of delay and deception. The Government has reviewed literally hundreds of e-mail communications between the defendant and the University Director, in which the defendant promises that the money will be available soon – only to see it delayed again at the last minute. The defendant's ongoing pattern of lies to the University was part and parcel of his fraud. By constantly putting off any repayment to the University Director, he was free to enjoy his cars, his house, and his other ill-gotten gains while the University remained in the dark as the nature of the defendant's deception.

Even when the defendant did invest in CMOs, he made sure that the ultimate gains did not return to his victim. For example, the defendant used some of the University's money to invest in a particular series of CMOs. He then passed them on to a third party in a financing transaction. When that deal went awry, the defendant engaged in protracted litigation with his counterparty, ultimately resulting in the return of the CMOs to the

2

defendant. But the defendant did <u>not</u> then provide the CMOs to the University, nor did he sell them and return the proceeds to the University, nor did he provide to the University any of the interest income that the CMOs were generating while the defendant held them. The defendant kept the CMOs – and the tens of thousands of dollars in cash that they were generating on a regular basis – and never provided any of the benefit to the University. Indeed, at <u>no</u> point before his arrest did the defendant ever provide anything of value back to the University – not the promised profits, nor the principal investment, nor the CMOs themselves, nor any of the interest they generated.

When, after an extensive investigation, law enforcement moved in to arrest the defendant, he continued his pattern of deception. The Federal Bureau of Investigation ("FBI") first tried to arrest the defendant at his Boynton Beach home, which had been purchased with proceeds from the fraud. Failing to locate him there, an investigator called the defendant to explain that there was a warrant for his arrest. The defendant claimed that he was in New York State and he would make his way down to New York City to surrender that day. After a few hours passed and there was no sign of the defendant at the federal courthouse, an agent tried him again. This time, the defendant claimed that he was in New Hampshire and that he needed additional time to negotiate his surrender. Concerned about this inconsistency in the defendant's location, law enforcement applied for and obtained permission to collect geolocation data from the defendant's cellular telephone. That data put the defendant in still a third state: North Carolina, where the defendant had a second home. When the agents spoke to him later that day, as they made plans to put together an arrest team in North Carolina, the defendant continued to maintain that he was in New England and on his way to surrender. He was arrested in his North Carolina residence the next day and remanded pending trial.

### B. Guidelines Analysis

The Guidelines analysis in the PSR matches the tabulation stipulated to by the parties in the plea agreement signed by the defendant on February 18, 2014. The base offense level for securities fraud is seven. See U.S.S.G. § 2B1.1(a). Because the defendant agrees that the loss associated with his fraud was the entire $8.165 million he stole from the University, the offense level is increased by twenty levels. Less three levels for acceptance of responsibility, this yields a total offense level of 24.

Although the PSR details nine separate prior arrests of the defendant, there are no reported convictions. Accordingly, the defendant's Criminal History Category is I. Thus, the Guidelines range stipulated to by the parties in the plea agreement is the appropriate range at sentencing: 51 to 63 months' imprisonment.

### C. Section 3553(a) Analysis

In his submission, the defendant suggests that a sentence of time served – less than one year in prison – is appropriate in this matter. It is not. The defendant engaged in a scheme to deprive the University of over $8 million in funds which had been entrusted to his care over a period of four years. The defendant paired his savvy and financial acumen with lies, first to lure the University Director into providing him the funds and then later to keep the University from reporting the matter to law enforcement for as long as possible. While the University Director fruitlessly tried to learn what had happened to the University's money and when they might get some of it back, the defendant lived the good life, purchasing multiple high-end luxury cars and beachfront property. The Government respectfully submits that an examination of the factors set forth in 18 U.S.C. § 3553(a) strongly recommends a Guidelines sentence in this case.

1. **The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

The defendant stole $8.165 million from the University. He used his considerable eloquence and charm to convince the University Director that he would be able to reap rapid gains from a sizable investment by the University. While the defendant claims in his submission that "[t]his was not a situation where Seth Betts woke up one morning and set out on a path to scheme" the University, see Defendant Sentencing Memorandum ("Def. Mem.") at 2, that misses the point. The defendant admitted in his plea allocution that he obtained the monies from the University through lies. See Plea Transcript ("Pl. Tr.") at 12 ("THE DEFENDANT: "To invest in a project with me, I made certain representations to them. . . . Some of those representations were not true."). These lies included fabulous tales of how he would be able to achieve significant profits for the University within weeks, based on his extensive knowledge of how to monetize CMOs. He took millions of dollars that he received and spent it immediately and directly on himself. He did not tell the University this. He took some of the remaining money and invested it in CMOs, but not under the terms of the deal that he had pitched to the University. He did not tell the University this. When those "get rich" investments failed to pan out, he never returned anything of value to the University: not the principal investment, not the CMOs that he purchased, and not the tens of thousands of dollars in interest the CMOs were generating, which he kept for himself. Unsurprisingly, he did not tell the University this either.

The defendant makes much of how he has demonstrated "extraordinary acceptance of responsibility" in this case by "instruct[ing] counsel to liquidate the house and cars purchased" with funds from the scheme. See Def. Mem. at 6. But the University did not recoup a single dollar of the $8.165 million it gave to the defendant until after the defendant was arrested in this case. And this was despite hundreds of e-mails sent by the University

5

Director and others to the defendant in an attempt to get back even some of the University's investment over a four-year period.  While it is something that the defendant liquidated his ill-gotten gains after his arrest to begin paying back his victim, as opposed to hiding the assets or moving them offshore, it is not "extraordinary acceptance."  The Government had already itemized his beachfront home as a seized property in a forfeiture bill of particulars and placed a <u>lis pendens</u> against it.  Its forfeiture was inevitable.  A money judgment against the defendant based on his fraud – such as he has now agreed to in the Consent Order of Forfeiture signed at the time of his plea – would also be forthcoming and required under law.

Whatever responsibility the defendant has accepted began after his significant and ill-advised efforts to evade arrest at the commencement of this action.  After four years of lying to the University, it is perhaps unsurprising that the defendant believed that he could evade capture by lying to agents from the FBI and an investigator from the United States Attorney's Office.  While no members of law enforcement were placed in danger by the defendant's efforts to avoid arrest, and he did not commit any additional crimes known to the Government during the additional period he remained at liberty through his deception, his ongoing pattern of lies under these circumstances is indicative of his casual disregard for the truth.

The defendant is the product of an upper class background and successful parents.  PSR ¶ 56.  He appears to be – and presents as – a highly-educated individual, although the nature of that education remains somewhat unclear.  As the Probation Office notes, the defendant indicated in his pre-sentence interview that he completed one year of community college education in England, followed by three semesters of work at Florida Atlantic University.  PSR ¶¶ 70, 71.  There are issues with both of these claims, however.  As the Probation Office notes, Florida Atlantic University does not appear to have any records of the defendant attending that institution.  PSR ¶ 70.  This cuts against the manner in which the

defendant held himself out to the investing public, as can be seen from a <u>South Florida Business Leader</u> article written in the Fall of 2009, in which the defendant claims that he "graduated from Florida Atlantic University with a Bachelor's Degree in Mathematics and a Master's Degree in Electrical Engineering." (Exhibit A.) The defendant also indicated in his interview with Pretrial Services at the time of his initial appearance in this matter that he has a degree from Cambridge University in England.[1]

   Even leaving these bizarre inconsistencies aside, the defendant is clearly an educated individual who cannot claim to have been denied the opportunities that have evaded the reach of many other defendants that come before the Court for sentencing. His crime was one of greed, not of necessity. When law enforcement went to arrest the defendant, they did not find him, but they saw his $1.5 million dollar home and multiple luxury cars worth hundreds of thousands of dollars. All of these assets were fruits of the defendant's fraud and evidence that he had no compunctions about taking money entrusted to him by the University and using it to create a high-class life for himself.

   Accordingly, the nature of the crime and the characteristics of the defendant recommend a Guidelines sentence.

> **2. The need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training and treatment (§ 3553(a)(2))**

   The Government respectfully submits that a Guidelines sentence would best support the sentencing considerations set forth in 18 U.S.C. § 3553(a)(2). Securities fraud is a serious offense, and one that lends itself well to the possibility for specific and general deterrence. Unlike individuals engaged in street crime, educated individuals engaging in

---

[1] As the Court may be aware, the parties are allowed to view the Pretrial Services report at the time of a defendant's initial appearance but are not allowed to retain copies. This assertion is based on notes taken by the undersigned AUSA during the defendant's initial appearance in this District.

sophisticated frauds involving complex monetary instruments can legitimately be expected to engage in a gain-loss calculus with respect to their actions, especially when driven not by need but by want. A Guidelines sentence sends a significant message to those deciding whether to commit fraud to improve their lifestyle. A sentence of time served, on the other hand, especially on the basis of giving back some of the stolen funds when caught, might well lead an individual to conclude that the crime is worth the risk. Similarly, the public must be protected from fraudsters who hold themselves out as experts in the financial arena and who convince victims to part with their investment dollars.

Accordingly, these factors also recommend a Guidelines sentence.

### 3. The need to avoid sentencing disparities (§ 3553(a)(6))

Finally, the defendant points to the case of United States v. Matthew Taylor, 13 Cr. 251 (WHP), as a matter the Court should look to in order to avoid sentencing disparities. The Taylor case, in which the defendant received nine months' imprisonment, and the present matter are not on all fours. In Taylor, the crime – the accumulation of a series of impermissible trading positions at Goldman Sachs & Co. – occurred over a total of 36 hours. Here, the defendant procured three separate wire transfers over a period of six months, used millions of dollars on himself, and then lied about it to the University over a period of four years. He never accepted responsibility for his actions or returned any of the money until he was arrested by law enforcement. In Taylor, the crime occurred almost five years before the defendant's arrest, and the defendant appears to have by all accounts lived a law abiding life during the intervening period. Here, the defendant continued to lie and cover up his deception right up through his arrest by the FBI. In Taylor, the defendant had compelling family circumstances that militated towards the possibility of a non-Guidelines sentence. Those family circumstances are absent here. The Probation Office has recognized

8

these differences. In Taylor, they recommended a year and a day of imprisonment. Here, they recommend a Guidelines sentence.

Accordingly, there is no concern that a Guidelines sentence here will create a sentencing disparity.

### D.     Conclusion

The defendant stole $8.165 million from the University. He spent millions on himself. He invested sums in manners inconsistent with how he told the University he would invest them, and then refused to return to them either the principal or any of the substantial interest derived from those funds. He engaged in a four-year pattern of deception to maintain and to cover-up his crime, all the way through his lies to law enforcement on the day before his arrest.

Under these circumstances, the Government respectfully submits that the Court should sentence the defendant to a Guidelines sentence in this case.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:      _____/s/_____
Telemachus P. Kasulis
Assistant United States Attorney
(212) 637-2411

cc:     Deveraux L. Cannick, Esq.